UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JENNIFER ADAMCZYK-DRUMMOND,

               Plaintiff,         Civil Action No.: 15-13493
                                      Honorable Gershwin A. Drain
               v.              Magistrate Judge Elizabeth A. Stafford

CAROLYN W. COLVIN,
Acting Commissioner of
Social Security,

               Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [R. 15, 16]

     Plaintiff Jennifer Ann Adamczyk-Drummond (Drummond) appeals a

final decision of Defendant Commissioner of Social Security

("Commissioner") denying her application for Supplemental Security

Income Benefits ("SSI") under the Social Security Act (the "Act"). Both

parties have filed summary judgment motions, referred to this Court for a

report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). After

review of the record, the Court finds that the administrative law judge's

credibility determination is not supported by substantial evidence and thus

**RECOMMENDS** that:

- Drummond's motion **[ECF No. 15]** be **GRANTED**;

- The Commissioner's motion be **[ECF No. 16]** be **DENIED**; and

- This matter be **REMANDED** for further proceedings pursuant to
  sentence four of 42 U.S.C. § 405(g).

## I.   BACKGROUND

### A.   Claimant's Background and Claimed Disabilities

Born April 12, 1970, Drummond was 43 years old when she
submitted her applications for disability benefits on August 15, 2013.  [ECF
No. 10-2, Tr. 25].  She alleges that she is disabled by interstitial cystitis
(IC), fibromyalgia, chronic severe pain syndrome, irritable bowel syndrome,
major severe depression, chronic fatigue, herniated disk, and seizure
activity with an onset date of August 15, 2013.  [ECF No. 10-6, Tr. 262-3].

After the Commissioner denied her disability application initially,
Drummond requested a hearing, which took place on March 18, 2015, and
included the testimony of Drummond and a vocational expert ("VE").  [ECF
No. 10-2, Tr. 33-81].  In an April 21, 2015, written decision, the ALJ found
Drummond not disabled.[1]  [*Id.*, Tr. 10-26].  The Appeals Council denied
review, making the ALJ's decision the final decision of the Commissioner,

---

[1] A prior ALJ found in October 2011 that Drummond was not disabled.  The
instant ALJ found that Drummond now has a very different collection of
impairments such that she was not bound by the prior RFC.  [ECF No. 11-
2, Tr. 19].

and Drummond timely filed for judicial review.  [*Id.*, Tr. 7-9; ECF No. 1].

## B.     The ALJ's Application of the Disability Framework

A "disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner determines whether an applicant is disabled by analyzing five sequential steps.  First, if the applicant is "doing substantial gainful activity," he or she will be found not disabled.  20 C.F.R. § 416.920(a)(4).  Second, if the claimant has not had a severe impairment or a combination of such impairments[2] for a continuous period of at least 12 months, no disability will be found.  *Id.*  Third, if the claimant's severe impairments meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, the claimant will be found disabled. *Id.*  If the fourth step is reached, the Commissioner considers its assessment of the claimant's residual functional capacity ("RFC"), and will find the claimant not disabled if he or she can still do past relevant work.

---

[2] A severe impairment is one that "significantly limits [the claimant's] physical or mental ability to do basic work activities."  §920(c).

*Id.* At the final step, the Commissioner reviews the claimant's RFC, age, education and work experiences, and determines whether the claimant could adjust to other work. *Id.* The claimant bears the burden of proof throughout the first four steps, but the burden shifts to the Commissioner if the fifth step is reached. *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Applying this framework, the ALJ concluded that Drummond was not disabled. At step one, she determined that Drummond had not engaged in substantial gainful activity since her application and onset date of August 15, 2013. [ECF No. 10-2, Tr. 13]. At step two, she identified the severe impairments of IC, fibromyalgia, obesity, depression and anxiety. [*Id.*, Tr. 13]. At step three, the ALJ concluded that none of Drummond's impairments, either alone or in combination, met or medically equaled a listed impairment. [*Id.*, Tr. 16-19].

Between the third and fourth steps, the ALJ found that Drummond had the RFC to perform a limited range of light work:

> Specifically, *at her best* she is able to lift or carry up to 10 pounds occasionally or less than 10 pounds frequently. She can stand or walk up to four hours of an eight-hour work day or sit up to six hours of an eight-hour work day. She can occasionally climb stairs or ramps, but not ladders or scaffolds. She can occasionally stoop, crouch, crawl, or kneel. The work she can perform does not involve commercial driving, or exposure to hazards such as unprotected heights or uncovered

4

industrial machinery.  She can perform simple routines
repetitive tasks, and can make simple work-related decisions.
She can handle a few changes in the work setting.

[*Id.*, Tr. 19 (emphasis added)].  At step four, the ALJ found that Drummond

could not perform past relevant work.  [*Id.*, Tr. 23].  With the assistance of

VE testimony [*Id.*, Tr. 22], the ALJ determined at step five that based on

Drummond's age, education, work experience and RFC, she could perform

work as a system monitor, checker/inspector, and packer, and that those

jobs existed in significant numbers in the economy, rendering a finding that

she was not disabled.  [*Id.*, Tr. 25-6].

## II.    STANDARD OF REVIEW

Pursuant to § 405(g), this Court's review is limited to determining

whether the Commissioner's decision is supported by substantial evidence

and was made in conformity with proper legal standards.  *Gentry v. Comm'r*

*of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014).  Substantial evidence is

"more than a scintilla of evidence but less than a preponderance; it is such

relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241

(6th Cir. 2007) (internal quotation marks and citation omitted).  Only the

evidence in the record below may be considered when determining

5

whether the ALJ's decision is supported by substantial evidence. *Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007).

The significant deference accorded to the Commissioner's decision is conditioned on the ALJ's adherence to governing standards. "Chief among these is the rule that the ALJ must consider all evidence in the record when making a determination, including all objective medical evidence, medical signs, and laboratory findings." *Gentry*, 741 F.3d at 723. *See also Rogers*, 486 F.3d at 249. In other words, substantial evidence cannot be based upon fragments of the evidence, and "must take into account whatever in the record fairly detracts from its weight." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (internal quotation marks and citation omitted).

The Commissioner must also adhere to its own procedures, but failure to do so constitutes only harmless error unless the claimant has been prejudiced or deprived of substantial rights. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009). An ALJ's failure to use an "adjudicatory tool" that does not change the outcome of the decision is harmless. *Id.* at 655-56. On the other hand, substantial errors like ignoring evidence in the record or failing to follow the treating physician rule are not harmless. *Id.*; *Gentry*, 741 F.3d at 723, 729; *Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir. 2011).

6

## III.   ANALYSIS

Drummond's arguments are summarized as follows: 1) the ALJ failed to comply with Social Security Ruling (SSR) 15-01 in evaluating her IC; 2) the ALJ failed to comply with SSR 14-1p[3] in finding that she was not actually diagnosed with chronic fatigue syndrome (CFS), and that CFS was not a severe impairment; 3) the ALJ did not afford the opinions of treating neurologist Gavin Awerbuch, M.D. and Nurse Practitioner Laura Hintz proper weight; and 4) the ALJ erred in assessing Drummond's credibility regarding the intensity of her pain.  For the reasons stated below, the Court finds that Drummond's arguments about the weight given NP Hintz's opinion and the assessment of Drummond's credibility hold merit.

### A.

"IC is a complex genitourinary disorder involving recurring pain or discomfort in the bladder and pelvic region" that can co-occur with fibromyalgia.  SSR 15-1p, 2015 WL 1292257 at *2.  When, as here, the ALJ has found IC to be a medically determinable impairment but that it

---

[3] Drummond uses SSR 99-2p in briefing in her position; however, SSR 99-2p was rescinded and replaced by SSR 14-1p, effective April 3, 2014. Thus, the Court will use SSR 14-1p, in place of SSR 99-2p, in evaluating Drummond's arguments. https://www.ssa.gov/OP_Home/rulings/di/01/SSR99-02-di-01.html (viewed on January 16, 2017).

does not meet or equal a listing, the ALJ must "consider all of the person's impairment-related symptoms in deciding how such symptoms may affect functional capacity."  SSR 15-01p, 2015 WL 1292257 at *8.

> For example, many people with IC have chronic pelvic pain, which can affect the ability to focus and sustain attention on the task at hand. Nocturia may disrupt sleeping patterns and lead to drowsiness and lack of mental clarity during the day. Urinary frequency can necessitate trips to the bathroom as often as every 10 to 15 minutes, day and night.

*Id.*

Drummond acknowledges that the ALJ's RFC considered her intermittent pelvic pain and consequent decreased attention and concentration, but argues that she did not take into account her other symptoms.  [ECF No. 15, PageID 842, citing ECF No. 10-2, Tr. 20].  As noted, the Court finds that the ALJ's analysis about the credibility of Drummond's level of pain is not supported by substantial evidence, but the record does not otherwise show that she presented the symptomology described in SSR 15-01p.

Drummond's diagnosis of IC was confirmed in December 2014 when she underwent a cystoscopy, but she was first diagnosed with IC in March 2002.  [ECF No. 10-3, Tr. 91; ECF No. 10-7, Tr. 609].  Joseph E. Oesterling, M.D., an urologist, treated Drummond from 2002 to 2004 for the condition, but when he could no longer help her, she began seeing Gavin

8

Awerbuch, M.D., a neurologist, for treatment of the pain. [ECF No. 10-2, Tr. 48, 50]. Drummond stated that, for ten years, her bladder pain was better until it "came back raging" in 2014, the year that Dr. Awerbuch stopped practicing. [*Id.* at 49-50]. The catalyst for her resurgent symptoms was that Drummond could not get the variety of narcotics she had gotten from Dr. Awerbuch, and Ariadne Lie, M.D. began trying to wean her from a fentanyl patch and subsys (a fentanyl spray) in May 2014. [ECF No. 10-7, Tr. 560, 583]. When Drummond saw Dr. Lie that May, she had run out of the spray and was having withdrawal symptoms, and she became very upset when Dr. Lie told her that she would be weaned off of the fentanyl patches. "She wants to know what she will do now for the pain." [*Id.*]. During Drummond's visit with Dr. Lie on July 1, 2014, Drummond stated that her IC was acting up, with increased urinary frequency and difficulty urinating, and she wanted to go back to her urologist. [*Id.,* Tr. 538].

Drummond thus returned to Dr. Oesterling one week later, and he noted that "her IC pain hasn't been an issue for years while being on a fentanyl but now urinary frequency and urgency are 'on and off' symptoms." [ECF No. 10-7, Tr. 469]. She described her pain as being 11, on a scale of 1-10, and her daytime frequency was about every 15-30 minutes. [ECF No. 10-7, Tr. 469]. Dr. Oesterling stated that Drummond had "now been

9

backed up to a 50 mcg of fentanyl and oxycodone 30 mg bid for break through." [*Id.*]. He, along with NP Hintz, began performing weekly bladder treatments for Drummond in July 2014. [ECF No. 10-2, Tr. 48]. Drummond's level of pain waxed and waned, but her other IC symptoms quickly improved:

- August, 18, 2014, Drummond's stream had improved, and she could hold her urine for two to three hours, and had only gotten up twice in seven days during the night to use the bathroom. [ECF No. 10-7, Tr. 484].

- September 9, 2014, Drummond's bladder was "actually doing better," and she could still hold her urine from two to three hours, with no nocturia. [*Id.*, Tr. 492].

- September 16, 2014, Drummond had more bladder pain, her stream was slowing down, but she still could hold her urine for two to three hours and had no nocturia. [*Id.,* Tr. 495].

- September 24, 2014, Drummond's bladder treatment helping, and she was voiding less and with normal amounts, but she only had three good days. [*Id.,* Tr. 499].

- September 30, 2014, bladder treatments did help, but her bladder had been acting up for three days and, although she

10

urinated with less frequency and with normal amounts, she had an increased difficulty urinating. [*Id.,* Tr. 503].

- October 13, 2014, Drummond's bladder pain had not improved since the last treatment and she felt that her pain was out of control.  She was still receiving fentanyl but was prescribed Dilaudid instead of oxycodone.  She continued to void less frequently and with normal amounts, and have no nocturia. [*Id.*, Tr. 507];

- October 27, 2014, her bladder pain again had not improved since the last treatment and she again felt that her pain was out of control, but she continued to void less frequently and with normal amounts, and had "nocturia x 0-1." [*Id.*, Tr. 511];[4]

- November 12, 2014, bladder pain did improve since last treatment, and had more good days in the past two weeks than she had in a long time. "She has been very busy.  She feels the bladder does get worse after she does tough strenuous work." Although she was having difficulty urinating, she was voiding

---

[4] Dr. Lie's notes similarly show Drummond complaining in October 2014 of pain that never goes away, and stating that she was not going to her therapist despite an increase in depression because she cannot tolerate the bladder spasms caused by a car ride.  [ECF No. 10-7, Tr. 565].

11

less frequency with normal amounts, and had "nocturia x 0-1."
[*Id.*, Tr. 516];

- November 26, 2014, bladder pain did improve since last
  treatment and she had more good days. She still had less
  frequent voiding and with normal amounts, and "nocturia x 0-1."
  [*Id.*, Tr. 611];

- December 9, 2014, Drummond's bladder pain did improve after
  the last treatment, and while she had increased difficulty
  urinating, and her stream was slowing down, she still had less
  frequent voiding and with normal amounts. She had "nocturia x
  1-2". [*Id.*, Tr. 615];

- December 18, 2014, Drummond was following up after an
  emergency room visit and desired a cystoscope to assess the
  internal tissues of her bladder.  She complained of intense
  bladder pain, spasms and pelvic pain, [*Id.,* Tr. 622];

- December 31, 2014, Drummond reported that her symptoms,
  including her pain, were slowly improving, and that she had
  more good days and could hold her urine for two hours and had
  "nocturia x 1" without Vesicare (which treats urinary frequency).
  [*Id.*, Tr. 630].

- January 12, 2015, Drummond again stated that her symptoms were slowly improving and that she had some really good days, although the last few had been worse. She reported that Botox had decreased the pain, but that she was having difficulty urinating. She continued to be able to hold her urine for two hours and to have little nocturia even without Vesicare.[5] [*Id.*, Tr. 634].[6]

Thus, Drummond did not experience anything close to the urinary frequency of every 10 to 15 minutes or the nocturia that SSR 15-1p describes as impairment-related symptoms, and the ALJ did not err in assessing an RFC without accounting for such symptoms.

**B.**

The ALJ noted that chronic fatigue syndrome (CFS) had been mentioned in Drummond's medical records, but found that those were not

---

[5] Drummond's brief mistakenly states that the Botox increased her pain, while the medical note indicates that it decreased her pain. [ECF No. 10-7, Tr. 634].

[6] During this period, in addition to the fentanyl, Diluadid, Vesicare and Botox referenced above, Dr. Osterling and NP Hintz tried to alleviate Drummond's symptoms with a host of medications, including Elavil, Flomax, Premarin, Elmiron, Rapaflo, Valium (taken vaginally), ice packs and a TENS unit, many of which she reported were helpful. [ECF No. 10-7, Tr. 492, 495, 499, 503, 507, 511, 516, 611, 615, 622, 630, 634].

diagnoses but instead were complaints related to other determined medical impairments, sleep apnea or her high doses of potent narcotics.  [ECF No. 10-2, Tr. 14, 21-22].  Drummond argues that the ALJ should have addressed her alleged CFS as a systemic disorder under Social Security Regulations.  The Court finds that any error resulting from the ALJ's decision to not find that CFS was an independent diagnosis would be harmless.

SSR 14-1p defines CFS as "systematic disorder consisting of a complex of symptoms that may vary in frequency, duration and severity."

> The hallmark of CFS is the presence of clinically evaluated, persistence, or relapsing chronic fatigue that: 1) is of new or definite onset (that it, has not been lifelong); 2) cannot be explained by another physical or mental disorder; 3) is not the result of ongoing exertion; 4) is not substantially alleviated by rest; and 5) results in substantial reduction in previous levels of occupational, education, social, or personal activities.

SSR 14-1p, 2014 WL 1371245, at *3.  Additionally, the regulation requires the presence of at least four specific symptoms[7] that persist for at least six months.  Drummond bears the burden of establishing that CFS is a

---

[7] These symptoms include: "postexertional malaise lasting more than 24 hours; self reported impairments in short-term memory or concentration severe enough to cause substantial reduction in previous levels of occupations, education, social, or personal activates; sore throat; tender cervical or axillary lymph nodes; muscle pain; multi-joint pain without swelling or redness; headaches of a new type, pattern, or severity; and waking unrefreshed."  SSR 14-1p.

14

medically determinable impairment, *Preslar*, 14 F.3d at 1110, and the evidence that she relies upon is insufficient.

Drummond cites various medical reports indicating that she has CFS or severe fatigue.  [ECF No. 10-7, Tr. 279, 282, 321, 323, 514, 534; ECF No. 10-8, Tr. 716].  However, she does not cite to any record establishing that evaluations were conducted to rule out other physical or mental disorders, as required by SSR 14-1p.  *Rounds v. Comm'r of Soc. Sec.*, No. 15-12440, 2016 WL 5661594, at *6 (E.D. Mich. Sept. 30, 2016) ("As explained in SSR14-1p, CFS is only diagnosed when the symptoms cannot be explained by another physical or mental disorder.").

Even if Drummond had met her burden in establishing CFS to be medically determined impairment, she must also demonstrate that the functional limitations that arise from her severe impairment require a more restrictive RFC.  *See Preslar,* 14 F.3d at 1110; *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988). Drummond asserts if CFS was found to be a medically determinable impairment, the ALJ would have given more weight to the opinions of Dr. Awerbuch and Ms. Hintz, and consequently, "a significantly more restrictive RFC would have been adopted."  [ECF No. 15, PageID 850].  But the ALJ stated that she crafted an RFC to take into account the diagnoses she opined may have caused Drummond's severe

15

fatigue and her "drowsiness from her pain medication."  [ECF No. 10-2, Tr.

23]. Given that, any error as a result of the ALJ failing to consider CFS a

severe impairment is harmless.  *Rounds,* 2016 WL 5661594 at *6 (any

error harmless when "doctors diagnosed plaintiff with other conditions that

might have caused his reported symptoms of fatigue and dizziness and that

the ALJ fully considered and accounted for these conditions and symptoms

in formulating his RFC.").

## C.

The "treating physician rule" requires an ALJ to give controlling

weight to a treating physician's opinions regarding the nature and severity

of a claimant's condition when those opinions are well-supported by

medically acceptable clinical and diagnostic evidence, and not inconsistent

with other substantial evidence.  *Gentry*, 741 F.3d at 723, 727-29; *Rogers*,

486 F.3d at 242-43.  "Even when not controlling, however, the ALJ must

consider certain factors, including the length, frequency, nature, and extent

of the treatment relationship; the supportability of the physician's

conclusions; the specialization of the physician; and any other relevant

factors," and give appropriate weight to the opinion.  *Gentry*, 741 F.3d at

723.  In all cases, a treating physician's opinion is entitled to great

deference.  *Id.*

16

Drummond asserts that Dr. Awerbuch's opinions are well supported by the record and that the ALJ was required to evaluate each of his opinion's, but only evaluated one.  There are numerous notes in the record where Dr. Awerbuch opined that Drummond is disabled and unable to work, [ECF No. 10-7, Tr. 277, 279-80, 323, 285-86, 418-19, 421-26]; yet, the ALJ only referred to May 2013 fibromyalgia impairment question, which was the most recent opinion.  [ECF No. 10-2, Tr. 20, referring to ECF No. 10-7, Tr. 421-26].  The ALJ gave that opinion little weight, reasoning that the opinion that Drummond was disabled from all work pertains to an issue reserved for the Commission and that Dr. Awerbuch's opinion was largely based on "uncritical acceptance of [Drummonds'] subjective complaints" and "not supported by the medical record and are inconsistent with other medical evidence of record."  [ECF No. 10-2, Tr. 21].  The Commissioner concedes that the ALJ did not properly evaluate the May 2013 opinion because, in it, Dr. Awerbuch identified specific functional restrictions.  [ECF No. 16, PageID 916, citing ECF No. 10-7, Tr. 424].

Nonetheless, the Commissioner argues that that error was harmless at most because the May 2013 opinion preceded Drummond's alleged onset date of August 15, 2013.  That argument is well-supported by legal precedent.  *Moore v. Colvin*, No. 14-12310, 2015 WL 4066735, at *4 (E.D.

17

Mich. July 2, 2015) ("[F]ailure to mention even a treating source's opinion predating the alleged onset is, at most, harmless error."); *Mohssen v. Comm'r of Soc. Sec.*, No. 12–14501, 2013 WL 6094728, at *11 (E.D.Mich. Nov.20, 2013) (finding that the ALJ's failure to mention even a treating physician's opinion date a year before the alleged onset date was at most harmless error).

Indeed, "[t]he regulations require an ALJ to develop a 'complete medical history,' meaning that for a plaintiff who alleges an onset date '***less than 12 months before [they] filed*** ..., [the ALJ] will develop [the] complete medical history ***beginning with the month [the plaintiff] say [s] [their] disability began*** unless [the ALJ has] reason to believe [the] disability began earlier.'" *Mosley v. Colvin*, No. 1:12-CV-00023, 2013 WL 4718987, at *12 (M.D. Tenn. Aug. 30, 2013) (emphasis in original) (citing 20 C.F.R. § 416.912(d)(2)). In light of the pertinent regulation, the treating physicians' opinions in *Mosley* that were offered prior to the alleged onset date were not relevant to the medical history. *Id.* But the court found that the opinions at issue were relevant background evidence for determining whether the doctors at issue were treating physicians. *Id.* Applying this precedent, none of Dr. Awerbuch's opinions are entitled to controlling weight, but they are relevant background evidence, as described below, for

18

addressing the ALJ's implication that Drummond's diagnosis of fibromyalgia was questionable.

Also at issue is NP Hintz's opinion that, despite Drummond's compliance with her medications, "it would be difficult for [her] to develop and maintain any type of working career." [ECF No. 10-8, Tr. 699]. The ALJ gave NP Hintz's opinion no weight. [ECF No. 10-2, Tr. 15]. She reasoned that Ms. Hintz is not an acceptable medical source, that her opinion was not consistent with the medical records, and that there is "no evidence that Ms. Hintz actually treated [Drummond] and what her contemporaneous opinions and conclusions were about that treatment." [ECF No. 10-2, Tr. 15-16, 21].

A nurse practitioner is not considered to be an "acceptable medical source." SSR 06-03p, 2006 WL 2329939, at *2. But under the ruling, "opinions from non-medical sources who have seen the claimant in their professional capacity should be evaluated by using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). And contrary to the Commissioner's argument that the ALJ was entitled to afford little weight to NP Hintz's opinion just because she was not an

19

"acceptable medical source," the opinions of a nurse practitioner may be entitled to greater weight than those from a treating physician if a the nurse practitioner treated the plaintiff more frequently and provided a better explanation for her opinion. *Woodcock v. Comm'r of Soc. Sec.*, ___ F.Supp.3d. ___, 2016 WL 4382728[8] (S.D. Ohio Aug. 16, 2016) (citing SSR 06-03p, 2006 WL 2329939 at *5).

The ALJ relied heavily on the fact that NP Hintz's signature is not on the medical records as a basis for not providing the opinion any weight. [ECF No. 10-2, Tr. 21]. The Commissioner concedes that "the ALJ's finding in this regard is not a strong point," [ECF No. 16, PageID 918], which is an understatement. Although NP Hintz did not sign the treatment notes, she wrote a letter in July 2014 indicating that she treated Drummond and describing those treatments, [ECF No. 10-7, Tr. 581]; she wrote a letter in February 2015, where she referred to Drummond as her patient and stated that she had been under her care since July 2014, [ECF No. 10-8, Tr. 699]; Dr. Oesterling submitted a statement confirming that NP Hintz, who he said is board certified and considered an expert in treating IC, had treated Drummond on a regular basis, and that he co-signed off on her progress

---

[8] As of the date of this report and recommendation, star paging is not available on Westlaw for this opinion; the entire opinion is paginated as "*1".

notes within his office's electronic medical records system, [ECF No. 10-8, Tr. 714]; and Drummond repeatedly referred to NP Hintz as a treater during the hearing before the ALJ, [ECF No. 10-2, Tr. 39, 47-54]. The ALJ's refusal to accept that NP Hintz treated Drummond is bewildering, and not supported by substantial evidence.

The ALJ also found that NP Hintz's opinion that, even on her good days, Drummond could not "maintain 'any type of working career,'" conflicted with the November 2013 indication in the medical record that Drummond had been "very busy" and "performed tough strenuous work." [ECF No. 10-2, Tr. 21]. That reasoning does not carry weight, as NP Hintz noted that Drummond also had bad days, and those intermittent bad days may render Drummond incapable of developing and maintaining a working career. This matters, because the ALJ's assessment of Drummond's RFC described what she could do when "at her best," [ECF No. 10-2, Tr. 19], deeming questionable whether the RFC is sufficient for those times when she is not at her best.

For these reasons, the ALJ's reasons for giving NP Hintz's opinion no weight are not supported by substantial evidence, and that error is not harmless.

21

## D.

Drummond argues that the ALJ erred in evaluating her credibility in regard to her testimony on her pain and limitations, and that the credibility finding was not supported by substantial evidence. [ECF No. 15, PageID 861]. Credibility determinations of witnesses are within the province of the ALJ and should not be disturbed "absent compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). At the same time, "such determinations must find support in the record." *Rogers,* 486 F.3d at 247. Here, the Court finds that the ALJ's credibility determination did not find support in the record, and remand should be granted on that basis.

A review of the records is warranted before addressing the ALJ's credibility analysis, but the Court will not repeat the evidence regarding's Drummond's IC or alleged CFS. It would appear undisputed that Drummond suffers from fibromyalgia. As noted, a prior ALJ found that Drummond had a severe impairment of fibromyalgia in an October 2011 decision, noting that she had been diagnosed with the impairment in 2001. [ECF No. 10-3, Tr. 87]. More recently, in an April 2013 attending physician's statement, Dr. Awerbuch indicated that Drummond was "permanently unable to work" due to fibromyalgia. [ECF No. 10-7, Tr. 419]. In his May 2013, he listed her points of pain, and opined that her RFC was

22

significantly limited due to her fibromyalgia, depression and other ailments. [ECF No. 10-7, Tr. 421-24]. He believed that Drummond was not a malingerer. [*Id.*].

Dr. Awerbuch examined Drummond on her alleged onset date, and recorded that she had "multiple trigger points to the posterior neck as well as her trapezius muscles. Positive Tinel's at the wrists. There is also crepitation with range of motion to the left shoulder." [*Id.*, Tr. 321]. Drummond reported adequate pain relief, but Dr. Awerbuch discussed with her the need for an "exit strategy" for her chronic opioid therapy, and he stressed that the goal should be "functional restoration" rather than complete pain relief. [*Id.,* Tr. 322]. Dr. Awerbuch obtained a drug screen, which he said was administered per guidelines in order to root out aberrant behavior, medication diversion or noncompliance, but he noted that Drummond had not exhibited any aberrant behavior. [*Id.*].

In October 2013, independent medical examiner R. Scott Lazzara M.D., found Drummond to have mild difficulty with orthopedic maneuvers, but he noted that "[t]here were no active trigger points today." [ECF No. 10-7, Tr. 399]. He still diagnosed Drummond with fibromyalgia as well as chronic fatigue that he said might be related to her pain medication. [*Id.*, Tr. 399]. Dr. Lazzara opined, "At this point increased cardio aerobic activity

23

and progressive weaning off her medications might be helpful to avoid any subsequent deterioration." [*Id.*].

Dr. Lie also found Drummond to suffer from fibromyalgia and identified tender points after her tearful May 2014 examination, when she tried to wean Drummond off of the fentanyl. [ECF No. 10-7, Tr. 525-27]. Drummond's father, who was concerned about Drummond's pain, accompanied her to her October 2014 appointment with Dr. Lie. [*Id.*, Tr. 560]. Dr. Lie discussed with him how Drummond's IC pain worsened once they tried to wean her from fentanyl; other medications did not help and the pain caused suicidal thoughts. [*Id.*]. In March 2015, Dr. Lie wrote a letter emphasizing that Drummond takes "high doses of narcotic medications due to the pain" associated with fibromyalgia, IC, and CFS, and that she "is NOT a drug seeking patient and I do not have any reason to believe that she is abusing her mediations or any other drugs for that matter." [ECF No. 10-8, Tr. 716]. Dr. Lie elaborated that Drummond had signed a contract with her clinic agreeing not to use any illegal substances; that she had been compliant with random urine drug screens, which had all been negative for any illicit substances; and that Dr. Lie regularly checked the Michigan Automated Prescription System (MAPS) and has confirmed that Drummond has not filled any of her prescriptions early. [*Id.*].

24

Rheumatologist Sanjeev Prakash, M.D., who had also seen Drummond in 2000 and 2001, examined her in August 2014. [ECF No. 10-7, Tr. 583-85]. Dr. Prakash noted that Drummond went to a chronic fatigue clinic at the University of Michigan in the late 1990s and was diagnosed with fibromyalgia then. [*Id.*]. After the August 2014 appointment, Dr. Prakash reported that most of Drummond's pain was in her lower back, buttock and arms, that her intermittent pain is aggravated by activity, and that she was very limited in that she was able to cook and dress herself, but not engage in much house or yard work. [*Id.*]. This assessment followed Dr. Prakash's physical examination, which revealed multiple trigger points (occiput, base of neck, over trapezius, interscapular area, posterior superior illac spine, greater trochanters, knees, anterior chest and elbows). [*Id.*]. Dr. Prakash had a "long discussion" with Drummond about her use of narcotics for 12 years, but she told him that she could not function without them. [*Id.*]. He gave Drummond a sample of an alternative medication, instructed her to have blood tests and x-rays, and suggested that she start a graded exercise program. [*Id.*].

In assessing Drummond's credibility, the ALJ found that Drummond's "allegations and subjective complaints lack credibility to the extent they purport to describe a condition of disability for Social Security purposes."

25

[R. 10-2, Tr. 23].  Much of the ALJ's reasoning in rendering this conclusion is not borne out by the record and is legally erroneous.

First, the ALJ did not properly assess Drummond's fibromyalgia.  She noted within her credibility analysis that, during Dr. Lazzara's examination, Drummond exhibited "no myofascial trigger points, necessary for a diagnosis of fibromyalgia."  [*Id.*, Tr. 22].  This statement is confusing because every examining and evaluating doctor diagnosed her with fibromyalgia and the ALJ determined that Drummond had a severe impairment of fibromyalgia, as did the prior ALJ.  [*Id.*, Tr. 14-15].  The instant ALJ noted that the diagnosis of fibromyalgia had been confirmed by the presence of 12 trigger points, and that Dr. Lazarra affirmed that diagnosis.  [*Id.*, Tr. 15].  It is unclear how the ALJ calculated the lack of trigger points the one day of Dr. Lazarra's examination into her evaluation of Drummond's credibility, but it is clear that substantial evidence cannot be based upon fragments of the evidence and "must take into account whatever in the record fairly detracts from its weight." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (internal quotation marks and citation omitted).

Because the record established that Drummond suffers from fibromyalgia, the ALJ was required to take into account that "fibromyalgia is

not susceptible of objective verification through traditional means . . . ."
*Rogers*, 486 F.3d at 234.  In *Rogers,* the ALJ erred in his credibility
analysis by pointing out the lack of objective medical evidence and the
plaintiff's normal reflexes and sensory test.  "[A]s previously discussed, the
nature of fibromyalgia itself renders such a brief analysis and over-
emphasis upon objective findings inappropriate."  *Id.* at 248. The *Rogers*
court cited with approval the language of *Canfield v. Comm'r of Soc. Sec.*,
No. CIV.A.01–CV–73472–DT, 2002 WL 31235758, at *1 (E.D.Mich.
Sept.13, 2002), stating that it would be "nonsensical to discount a
fibromyalgia claimant's subjective complaints of pain based upon lack of
objective medical evidence, as such evidence is generally lacking with
fibromyalgia patients."  *Id.*  In conflict with this Sixth Circuit precedent, the
ALJ found that Drummond's pain would be found to diminish her capacity
for basic work activities and RFC only to the extent that her "symptoms can
reasonably be accepted as consistent with the objective medical evidence
and other evidence."  [ECF No. 10-2, Tr. 22].  The ALJ then placed weight
on the fact that "diagnostic imaging studies and laboratory tests have been
unremarkable."  [*Id.*].

Compounding that error, despite the well-documented record
showing the Drummond repeatedly complained of severe pain, that she

27

was treated with heavy doses of narcotic medication for that severe pain, and that her pain levels became uncontrolled during efforts to wean her from narcotic pain medications to the point of causing her suicidal thoughts, the ALJ alleged that "[h]er allegations of diffuse, disabling pain are poorly documents in the medical record." [*Id.*]. The ALJ also cited to the one record in November 2013 in which stated that she had been very busy and that her symptoms were exacerbated by tough, strenuous work, but again, substantial evidence cannot be based on such a miniscule portion of the record. *Garner,* 745 F.2d at 388.

Without a citation to the record or medical expertise, the ALJ opined that "the accepted treatment for fibromyalgia is aerobic exercise, not the large amounts of very potent narcotics with which she was treated." [ECF No. 10-2, Tr. 22]. The Commissioner argues that Dr. Lazarra's recommendation that Drummond increase her aerobic exercise and progressively wean off of her medications supports the ALJ's broadly stated opinion regarding the appropriate treatment for fibromyalgia; it does not. That is especially true here where Dr. Lie, a treating physician, attempted to wean Drummond from her narcotic medication, only to result in a flare-up of her pain, and Dr. Prakash indicated that her pain was aggravated by activity. The ALJ was not permitted to substitute her own

28

medical judgment for that of Drummond's treating physicians. *Meece v. Barnhart*, 192 F.App'x 456, 465 (6th Cir. 2006). And in *Rogers*, the court specifically rejected the ALJ's credibility analysis that "placed significance" upon a doctor's testimony "that the best treatment for fibromyalgia is regular exercise, including walking and stretching." 485 F.3d at 249. "Of course, the fact that a patient is encouraged to remain active does not reflect the manner in which such activities may aggravate the patient's symptoms." *Id.*

Another parallel between this case and *Rogers* is the ALJ's emphasis on daily activities that do not compare to typical work activities. In *Rogers*, the plaintiff was noted to be "able to drive, clean her apartment, care for two dogs, do laundry, read, do stretching exercises, and watch the news . . . ." *Id.* The court found that "these somewhat minimal daily functions are not comparable to typical work activities." *Id.* Here, the ALJ found that Drummond's daily activities of preparing simple meals for herself, doing some light household chores, shopping, driving reading, watching television and playing computer games demonstrate that her "impairments do not significantly restrict her activities of daily living." [ECF No. 10-2, Tr. 18, 22, citing ECF No. 10-6, Tr. 219-22]. These are actually exaggerations of Drummond's reported daily activities, as she stated that she prepared

29

cereal, sandwiches and prepared foods to eat, but did not cook; that any household chores she performed did not require her to be on her feet more than ten minutes; and that her shopping was done by computer only. [ECF No. 10-6, Tr. 219-22]. In any case, even if Drummond performed daily activities as represented by the ALJ, that would not mean that she had the RFC to perform work requiring her to stand or walk for up to eight hours, or to work for eight hours at all.

Drummond stresses that the ALJ misread the evidence by finding that she tested negative for any types of opiates and thereby suggested she was not taking her medication. [ECF No. 15, PageID 862; ECF No. 10-2, Tr. 23]. Drummond is correct; she was found positive for oxycodone. [ECF No. 10-7, Tr. 544]. The ALJ raised the specter of Drummond misusing her narcotic medications, stating that the drug testing "begs the question as to what Ms. Adamczyk Drummond was doing with her pain medication, if not taking it." [ECF No. 10-2, Tr. 23]. The Commissioner doubled-down on the ALJ's suspicion, asking the Court to compare a toxicity screen with a medical report. [ECF No. 16, PageID 922]. But this Court does not have the expertise to make the correlation between the medical report and a particular toxicity screen, and the medical experts who treated Drummond noted that there was no evidence of aberrant use of her

medications, drug abuse, or that she was drug-seeking. [ECF No. 10-7, Tr. 322; ECF No. 10-8, Tr. 716]. Dr. Lie in particular detailed the steps she took to assure that Drummond was not taking illicit drugs and was taking her narcotic prescriptions only as prescribed. [ECF No. 10-8, Tr. 716]. The ALJ's questioning of Drummond's credibility based on alleged drug abuse does not find support in the record.

The ALJ stated that Drummond was drug-dependent, but that fact did not diminish her credibility in the absence of a finding that she was abusing her medications. The reports suggested that Drummond was dependent on the narcotic medications to control her pain, and that the attempt to wean her from them resulted in a flare-up of pain and resultant suicidal thoughts. And in fact, if Drummond had not been using narcotic medications and was simply attempting to control her symptoms through aerobic exercise, the ALJ would have likely found such conservative treatment to inconsistent with disabling symptoms. *See, e.g*, *Blair v. Astrue*, No. 3:08CV0637, 2009 WL 2905581, at *7 (M.D. Tenn. Sept. 3, 2009) (ALJ properly discredited claimant's testimony because he use only muscle-relaxants and over-the-counter Aleve to control pain); *Jamison v. Comm'r of Soc. Sec.*, No. 1:07CV152, 2008 WL 2795740, at *11 (S.D. Ohio July 18, 2008) (ALJ properly discredited claimant's testimony because he

never took any prescribed or over-the-counter pain medication).

In contrast, a claimant's use of strong narcotic medications has been considered consistent with allegations of disabling pain when their use is supported by treating physicians.  *Hill v. Astrue*, No. 3:08CV00190, 2009 WL 3110365, at *13 (S.D. Ohio July 17, 2009), *report and recommendation adopted in relevant part*, 2009 WL 3110364 (S.D. Ohio Sept. 23, 2009) (treatment with Oxycontin and Vicodin supported plaintiff's credibility when treating physicians did not question appropriateness of that treatment); *Brewer v. Astrue*, No. 5:09-CV-3023, 2011 WL 1304889, at *4 (N.D. Ohio Apr. 1, 2011) (plaintiff's use of prescribed "strong narcotic pain medication" along with other treatment supported her credibility).

The ALJ concluded that her assessment of Drummond's RFC is adequate to address Drummond's "bona fide symptoms" based upon the ALJ's assessment of her credibility.  [ECF No. 10-2, Tr. 23].  But since that credibility assessment impliedly questioned Drummond's fibromyalgia diagnosis; improperly relied on a lack of objective medical evidence; incorrectly relied upon a finding that Drummond's allegations of pain were poorly documented; improperly relied upon the ALJ's own lay opinion that Drummond should be treated only with aerobic exercises and not narcotic medications; relied in part on mischaracterized daily activities that are not

comparable to the work required by the RFC; relied upon an allegation that Drummond was abusing her narcotic medications when the medical experts explicitly said otherwise; and improperly treated Drummond's reliance on narcotic medications to control her pain as being somehow inconsistent with her allegations of pain, the ALJ's determination of Drummond's "bona fide" symptoms is not supported by the record or the law, and her assessment of Drummond's RFC is not supported by substantial evidence.

## IV.   CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that Drummond's Motion for Summary Judgment [ECF No. 15] be **GRANTED**, that the Commissioner's Motion for Summary Judgment [ECF No. 16] be **DENIED,** and this case be **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g). The ALJ should be ordered to re-evaluate her assessment of the weight given to NP Hintz's opinion and of Drummond's credibility.

<u>s/Elizabeth A. Stafford</u>
ELIZABETH A. STAFFORD
United States Magistrate Judge

Dated: January 26, 2017

## <u>NOTICE TO THE PARTIES REGARDING OBJECTIONS</u>

Either party to this action may object to and seek review of this

Report and Recommendation, but must act within fourteen days of service

of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P.

72(b)(2). Failure to file specific objections constitutes a waiver of any

further right of appeal.   *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v.

Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991)*; United States v. Walters*,

638 F.2d 947 (6th Cir. 1981).  Filing objections which raise some issues but

fail to raise others with specificity will not preserve all objections that party

might have to this Report and Recommendation.  *Willis v. Secretary of

HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers

Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  A copy of any objection

must be served upon this Magistrate Judge. E.D. Mich. LR 72.1(d)(2).

Each **objection must be labeled** as "Objection #1," "Objection #2,"

etc., and **must specify** precisely the provision of this Report and

Recommendation to which it pertains.  Not later than fourteen days after

service of objections, **the non-objecting party must file a response** to

the objections, specifically addressing each issue raised in the objections in

the same order and labeled as "Response to Objection #1," "Response to

Objection #2," etc.  The response must be **concise and proportionate in**

34

**length and complexity to the objections**, but there is otherwise no page limitation.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 26, 2017.

<u>s/Marlena Williams</u>
MARLENA WILLIAMS
Case Manager
